IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MORTGAGE LENDERS NETWORK USA, INC.,[1] | Case No. 07-10146 (PJW) |
| Debtor. | |
| GUISEPPE CACCAMO and ROBIE-LYN HARNOIS | Adversary Case No. 07-51415 (PJW) |
| Plaintiffs, | |
| v. | |
| MORTGAGE LENDERS NETWORK USA, INC., | |
| Defendant. | |

**Objection Deadline: April 30, 2009**
**Hearing Date: May 11, 2009 at 9:30 a.m. (prevailing Eastern Time)**

**JOINT MOTION OF PLAINTIFFS, THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS AND THE DEBTOR PURSUANT TO SECTION 105 OF THE
BANKRUPTCY CODE AND BANKRUPTCY RULES 9019 AND
7023 TO (I) APPROVE A SETTLEMENT AGREEMENT PURSUANT
TO BANKRUPTCY RULE 9019, (II) CERTIFY A CLASS CONSISTING
OF TWO SUBCLASSES OF WARN ACT CLAIMANTS FOR SETTLEMENT
PURPOSES ONLY, APPOINT CLASS COUNSEL, CLASS REPRESENTATIVES,
AND PRELIMINARILY APPROVE THE SETTLEMENT PURSUANT TO
BANKRUPTCY RULE 7023, (III) APPROVE THE FORM AND MANNER
OF NOTICE TO CLASS MEMBERS OF THE CLASS CERTIFICATION AND
SETTLEMENT, (IV) SCHEDULE A FAIRNESS HEARING TO CONSIDER FINAL
APPROVAL OF THE SETTLEMENT AGREEMENT, (V) FINALLY APPROVE
THE SETTLEMENT AGREEMENT PURSUANT TO BANKRUPTCY RULE
7023 AFTER THE FAIRNESS HEARING, AND (VI) GRANT RELATED RELIEF**

The above-captioned debtor and debtor in possession (the "Debtor"), the Official

Committee of Unsecured Creditors of the Debtors (the "Committee") and prospective class

representatives, Guiseppe Caccamo and Robie-Lyn Harnois (the "Class Representatives" or

---

[1] Debtor's EIN: XX-XXX7394. Debtor's Address: Middlesex Corporate Center, 213 Court Street, 11th Floor,
Middletown, CT 06457

"Named Plaintiffs"), on behalf of themselves and similarly situated prospective class members (together with the Class Representatives, the "Class Members"), by and through their respective counsel, hereby move (the "Joint Motion") this Court, pursuant to section 105 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 23 of the Federal Rules of Civil Procedure (the "Civil Rules"), applicable hereto by Bankruptcy Rule 7023, for the entry of an order: (a) approving the *Compromise and Settlement Agreement* (the "Settlement Agreement")[2] among the Debtor, the Class Representatives, and the Committee,[3] pursuant to Bankruptcy Rule 9019, (b) certifying a Class consisting of two subclasses for settlement purposes, appointing Klehr, Harrison, Harvey, Branzburg & Ellers, LLP as class counsel ("Class Counsel"), appointing Guiseppe Caccamo and Robie-Lyn Harnois as the Class Representatives and preliminarily approving the Settlement Agreement pursuant to Civil Rule 23, (c) approving the form and manner of notice to Class Members of the conditional class certification and settlement (the "Class Notice"), (d) scheduling a fairness hearing (the "Fairness Hearing") to consider final approval of the Settlement Agreement pursuant to Civil Rule 23, and (e) after the Fairness Hearing, finally approving the Settlement Agreement pursuant to Civil Rule 23. In support of the Joint Motion, the movants respectfully represent as follows:

---

[2] A true copy of the Settlement Agreement is attached hereto as <u>Exhibit A</u>.

[3] The Debtor, the Class Members, and the Committee are referred to herein collectively as the "Parties."

1.     The Court should approve the Settlement Agreement.   The Class

Representatives have sued the Debtor for allegedly failing to provide notice required by the

Worker Adjustment and Retraining Act, 29 U.S.C. §§ 2101 *et seq.* (the "WARN Act"), before

ordering mass layoffs and/or plant closings.  The maximum alleged WARN damages of the

Class Members who were paid on a hourly or salaried basis could exceed $7,000,000 plus

attorneys fees and costs, if the Class Representatives prevail.  In addition, 303 of the Debtor's

employees were paid on a commission-only basis.  Although the question is not settled in the

Third Circuit, the Debtor and Committee contend commission only employees are not entitled to

WARN damages because they would not have been able to earn commissions during the 60 day

period following their termination even had they not been terminated:  the Debtor was unable to

originate loans after December 29, 2006 because its lines of credit had been terminated and the

states it operated in issued cease and desist orders. Class Counsel disputes that commission-only

employees are not entitled to WARN damages and contends that the purpose of the WARN act is

to ensure that employers give appropriate and adequate notice of closure of operations and

termination of employment *prior* to the actual date such events occur, and that the argument that

commission-only employees should receive *no* WARN act damages on the grounds that there

was no business being conducted by the employer following their termination is tantamount to

arguing that hourly wage employees also should not receive any WARN act damages from their

employer because operations had ceased and therefore there was no hourly work available in the

---

[4]   Unless otherwise defined herein, capitalized terms have the meanings ascribed to them in subsequent sections of the Joint Motion.

sixty days following their termination. Class Counsel contends that such a reading of the law defeats the entire purpose of the WARN Act, and that commission-only employees should not be denied relief in the event an employer fails to comply with WARN Act notice provisions. In exchange for a full release for any claim for damages under the WARN Act or similar state law, severance, back pay or other benefits arising from the mass layoffs and/or plant closings, the Debtor's estate will make a payment to Class Counsel of $2.7 million, to be distributed by Class Counsel in accordance with the terms of the Settlement Agreement.

        2.     From the estate's perspective, the Settlement Agreement is fair and reasonable. The above-captioned WARN class action would be protracted and expensive, and the outcome uncertain. The Debtor believes that the fundamentals of the Debtor's business remained sound through the middle of the fall of 2006. However, the Debtor and the Committee contend that extraordinary and unforeseeable events in the residential housing and credit markets thrust the Debtor into an unanticipated liquidity crisis, which ultimately required the Debtor to cease all loan origination activity. Therefore, based on the unforeseeable business circumstances exception to the 60 days notice requirement of the WARN Act, the Debtor contends that it was excused from providing 60 days notice of the layoffs and shutdown that occurred in January 2007 and thereafter.

        3.     The Debtor asserts additional defenses including the faltering company exception and, to the extent that the unforeseeable business circumstances or faltering business exceptions to the WARN Act do not apply, the Debtor contends that it is entitled to a reduction

4

of any purported damages based on the Debtor's good faith belief that all of its actions complied with the provisions of the WARN Act.

4.      Class Counsel contends that the events that led to the Debtor's failure were foreseen and/or foreseeable and that none of the other WARN exceptions are applicable. In particular, Class Counsel contends that problems relating to the documents in the origination of sub-prime mortgages, and the rise in early defaults on loans that had closed, was well known in the industry well before the 60-day period prior to the shut down of the Debtor's business. In addition, as a result of extensive document production in this case, Class Counsel contends that the Debtor was actually aware it was facing a fatal liquidity crisis beyond the sixty-day window under the WARN Act.

5.      A trial on the applicability of the unforeseeable business circumstances exception would require both sides to engage in extensive expert and non-expert discovery at significant expense, with inherently uncertain results at trial. The total professional fees on both sides would easily exceed $1,000,000.

6.      Class Counsel also contends that if the Court found that the Class Members were entitled to even one additional day of notice than they were provided, then the Class Members would be the prevailing parties entitled to their attorneys' fees and costs. Thus, if the case is tried, the Debtor faces, at least a theoretical risk, of being liable for both sides' fees even if it established the unforeseeable business circumstances exception to the sixty days' notice requirement, if the Court finds the Debtor did not provide notice to the Class Members as soon as practicable.

7. In light of these factors, the Debtor and the Committee have determined that the Settlement Payment of $2.7 million is well within the range of reasonableness. Accordingly, the Parties respectfully submit that the Court should approve the Settlement under Bankruptcy Rule 9019.

8. For essentially the same reasons, the Settlement Agreement is also fair and reasonable to the Class Members. In addition, the Settlement Agreement provides an immediate payment to the Class Members. Without the settlement, the Class Members could wait years for any payment on their alleged WARN claims, even if they prevail at trial and appeal.

9. Further, it is appropriate to certify the Class for settlement purposes and appoint Class Counsel. As set forth below, for purposes of the settlement, the Parties agree that the Class meets all of the requirements of Civil Rule 23 and that Class Counsel is competent and experienced.

10. Finally, the Parties request a two-step approval process to facilitate notice to Class Members. After preliminary approval of the Settlement Agreement and the form of notice to be given to the Class Members, Class Counsel will provide notice ("Notice") to each Class Member that describes the Settlement Agreement, and informs the Class Members of their right to opt-out of the Class or object to the Settlement Agreement and of the deadlines for opting-out and/or objecting.

11. After service of the Notice, the Parties request that the Court set a Fairness Hearing at which it will finally approve the Settlement Agreement.

6

12.     Based on the foregoing, and as set forth more fully below, the Parties

submit that the Court should approve the Settlement Agreement and the procedures proposed in

this Joint Motion.

## Jurisdiction

13.     This Court has jurisdiction over the Motion under 28 U.S.C. § 1334.  This

matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper under

28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are section 105

of the Bankruptcy Code, Bankruptcy Rule 9019 and Civil Rule 23.

## Background

14.     On February 5, 2007 (the "Petition Date"), the Debtor commenced this

case (the "Bankruptcy Case") by filing a voluntary petition for relief under the Bankruptcy Code

in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

15.     The chapter 11 Bankruptcy Case is filed as *In re Mortgage Lenders

Network USA, inc.* Case No. 07-10146 (PJW).

16.     The Debtor has continued in possession of its property and has continued

to operate and manage its businesses as a debtor in possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code.

17.     No request has been made for the appointment of a trustee or an examiner

in this case.

18.     On or about February 3, 2009, the Bankruptcy Court entered an order

confirming the Debtor's First Amended Plan of Liquidation (the "Plan").

## The Debtor's Business and Events Leading Up to the WARN Action

19.     Prior to December 29, 2006, the Debtor was in the business of wholesale loan originations. As of December 31, 2006, the Debtor employed approximately 1,654 employees. Of these employees, 1,351 were paid on an hourly or salaried basis and 303 were paid on a commission-only basis. All of the Debtor's employees worked at sites that employed more than 50 employees at the time of their termination.

20.     The Debtor was one of hundreds of loan originators and servicers engaged in sub-prime loans that failed during the past two years. The Debtor worked with a network of independent mortgage brokers to provide financing for consumer borrowers on residential loans. Specifically, the Debtor originated prime wholesale loans to consumer borrowers in compliance with Fannie Mae and Freddie Mac guidelines, and sub-prime wholesale loans to consumer borrowers who were unable to qualify for prime lending on residential mortgages. The Debtor obtained the funds needed for its loan originations from warehouse lines of credit with various lenders ("Warehouse Lenders").

21.     The Debtor contends that unanticipated, rapid and extreme deterioration in the residential mortgage market thrust the Debtor into a fatal liquidity crisis in a matter of just days at the end of December 2006. Among the primary causes of this crisis were a pricing error in a newly developed loan product, the trailing effect of a significant increase in loan repurchases due to early payment defaults, significant and rapid deterioration of loan values in the secondary market reducing the price paid for loans and the unilateral decision by the Warehouse Lenders to withdraw capital from MLN due to the rapid deterioration in the residential mortgage market.

8

This decision was implemented in at least 4 ways: (i) margin calls (as defined below); (ii) reductions in advance rates; (iii) increased demands for quick repurchase of loans experiencing early payment defaults; and (iv) the hold back of premiums from loan sales.

22.     The Debtor contends that from the time it began operations in 1997 through the first three quarters of 2006, the Debtor was a growing, profitable company. Its customers' delinquencies on loan payments were well in line with the industry standard. Starting in September 2006, the Debtor first experienced an increase in demands from investors to pay amounts related to early payment defaults. The Debtor upgraded its underwriting guidelines in response. Since this tightening of lending standards would cause a decrease in the number of loans the Debtor could originate, the Debtor introduced a new, fixed-rate product (the "A++ Loans") in the fourth quarter of 2006. The new loans were mispriced resulting in a below market rate. Approximately $730,000,000 of the A++ Loans were originated resulting in a cash loss to MLN of approximately $11,000,000 that was not known until December 2006.

23.     The Debtor contends that, also in December 2006, the Debtor's lenders responded to the sudden and precipitous deterioration in the residential mortgage market by limiting and withdrawing capital. Enormous demands were made on the Debtor for the return of capital or margin calls at unprecedented levels. In December 2006, MLN experienced demands for capital from its lenders for over $41,000,000. In the previous months, the Debtor had virtually no margin calls or other capital withdrawals by its lenders and none were projected or anticipated in December. The Debtor's inability to satisfy the storm of margin calls and other demands for capital resulted in defaults under its financing agreements with its lenders. At the

9

same time, the Debtor's lenders tightened liquidity and increased demands for prompt repurchases of early payment default loans originated by the Debtor.

24.      In early December, two other subprime lenders went out of business. When MLN reported the pricing error and associated losses for the A++ Loans to its Warehouse Lenders (at about the same time as the news of the failure of the two other subprime lenders was reverberating through the market), the Warehouse Lenders significantly reduced advance rates on the funds used by the Debtor to originate loans. This reduction in advance rates required the Debtor to post additional collateral as security for such funds. When the Debtor was unable to do so, its financing for loan originations was terminated. Without funds to originate loans, the Debtor was forced to shut down its wholesale loan origination business on December 29, 2006.

25.      The Debtor contends that decisions by the lenders to withdraw capital from the Debtor were made suddenly and unilaterally by the lenders in connection with their internal concerns and analysis with respect to rapidly deteriorating market conditions in the residential mortgage industry which only became apparent in December 2006.

26.      The Debtor contends that, as a result of the shutdown of its wholesale loan origination business, the Debtor furloughed and/or terminated employees beginning on January 2, 2007 while it sought additional financing to revive its wholesale loan origination business.

27.      The Debtor contends, however, that the sudden liquidity crisis and the shutdown of its warehouse financing disabled MLN from funding outstanding loans. As a result, the State of Connecticut Department of Banking issued a Temporary Order to Cease and Desist against MLN on January 19, 2007 (the "Cease and Desist Order"). At approximately the same

10

time, additional Cease and Desist Orders were received by the MLN from several other states in which it had been originating loans. Pursuant to the cease and desist Orders, the Debtor was ordered, among other things, to stop further lending activity and to obtain replacement funding for the unfunded loan commitments.

28.     The Debtor contends that it was forced to terminate additional employees throughout the month of January. The Debtor contends that it emailed and mailed letters that constituted adequate notice under the WARN Act of any plant closing or mass layoff affecting such persons to the extent the WARN Act was applicable. Class Counsel disputes that WARN Act notice was adequate and/or that prior WARN notices were delivered to all employees that were terminated.

### Initiation of the WARN Act Litigation and Description of Claims

29.     On June 4, 2007, the Class Representatives, allegedly on behalf of themselves and on behalf of those similarly situated former employees of the Debtor, commenced an adversary proceeding titled, *Guiseppe Caccamo and Robie-Lyn Harnois v. Mortgage Lenders Network, USA, Inc.*, Adversary Proceeding No. 07-51415 (the "WARN Action") by filing a complaint against the Debtor. On September 10, 2007, the Class Representatives filed an amended complaint ("Complaint") alleging that the employment terminations violated the WARN Act by ordering plant closings and/or mass layoffs on or about January 2, 2007, and thereafter, without providing the sixty (60) days' of advance notice thereof. The Complaint sought damages in the amount of sixty (60) days' wages and benefits and alleged said damages were entitled to administrative priority.

11

30. On October 10, 2007, the Debtor filed its answer to the Complaint denying the material allegations of the Complaint and asserting, among other affirmative defenses, (i) the Complaint was barred by the faltering company exception as set forth in 29 U.S.C. § 2102(b)(1); (ii) the Complaint was barred by the unforeseen business circumstances exception set forth in 29 U.S.C. § 2102(b)(2)(A); (iii) the Debtor was not an employer as defined under the WARN Act but rather a liquidating fiduciary; (iv) the Debtor reasonably and in good faith believed that its actions complied with the WARN Act and that the terminations were lawful; and (v) the Debtor was entitled to offset any voluntary payments made to the Class Members from any damages suffered. The Debtor also denied that the WARN Act claims were entitled to administrative priority.

31. Certain Class Members have filed proofs of claim against the Debtor in the Bankruptcy Cases for amounts allegedly owed under the WARN Act ("Individual WARN Claims").

32. In addition, Robie-Lyn Harnois filed a class proof of claim on or about June 11, 2007 as claim number 288 ("Claim 288"). Claim 288 seeks damages for alleged violation of the WARN Act on behalf of Robie-Lyn Harnois, and allegedly on behalf of other similarly situated former employees of the Debtor whose employment was terminated by the Debtor prior to the Petition Date. Claim 288 alleges that total damages of the alleged class are "up to the lesser of $12,000,000 or the actual WARN Act damages."

33. By and through their counsel, Glenn Bonds, Steven Arnold, Catherine Berardi, Christopher Curtis, and Michael Breen (the "Alleged Representative Claimants") filed a

Class Proof of Claim on Behalf of Former Employees of Debtor on or about September 24, 2007 as claim number 371 ("Claim 371"). Claim 371 seeks damages for alleged violations of the WARN Act on behalf of the Alleged Representative Claimants, and allegedly on behalf of other similarly situated former employees whose employment was terminated by the Debtor on or about the Petition Date, and thereafter, based on wages, salary, commissions and bonuses for 60 working days and holiday pay, plus ERISA benefits for 60 days following the termination of employment. Claim 371 states that total damages to the alleged class for violations of the WARN Act is estimated to be $40,000,000.

34. On January 23, 2009, the Bankruptcy Court entered its order approving a stipulation between the Alleged Representative Claimants and the Class Representatives withdrawing Claim 288 and Claim 371 without prejudice to the rights of the Class Members to pursue their alleged rights under the WARN Act in the WARN Action.

### Discovery

35. On September 23, 2008, the Court entered its Scheduling Order setting times for initial disclosures, discovery cut offs and expert disclosures. An amended scheduling order was entered on January 1, 2009 pursuant to stipulation by the Parties to allow additional time for settlement discussions and informal discovery.

36. The Debtor and Class Representatives exchanged their initial disclosures under Fed. R. Civ. P 26(a)(1) on November 7, 2008.

37.    In response to the requests of Class Counsel, the Debtor produced in excess of 120,000 pages of documents and other materials relevant to the WARN claims and defenses to Class Counsel.

### The Settlement Negotiations

38.    On December 9, 2008, the Parties executed a *Pre-Negotiation Agreement* with the express intention of engaging in discussion and negotiations regarding the settlement of the WARN Action and all related claims.

39.    The Debtor, with the Committee, has engaged in a series of settlement negotiations with Class Counsel.

### Essential Terms of the Proposed Settlement

40.    In February 2009, the Debtor, the Committee and Class Counsel reached a tentative agreement, subject to Court approval, the terms of which were later refined and memorialized in the Settlement Agreement. In general, the Settlement Agreement provides for the payment of $2.7 million in settlement of the claims of the Class Members that the Debtor allegedly failed to provide adequate notice under the WARN Act. The settlement provides for a single payment to be made to Class Counsel to be distributed pursuant to the terms of the Settlement Agreement and described below. The essential terms of the Settlement Agreement are as follows:

- A class comprised of two subclasses will be certified for settlement purposes only (the "Class"). The Class will include all of the Debtors' employees who were terminated on or after December 1, 2006, other than employees who are not entitled to participate in the settlement because (i) they voluntarily resigned from their employment with the Debtor or were terminated for cause or good

14

reason; or (ii) they released the Debtor from any and all claims arising out of their employment; (collectively, the "Ineligible Employees"). The names of the Class Members are set forth on Exhibits B and C to the Settlement Agreement.

- The first subclass ("BMembers") includes all employees of the Debtor who were terminated without cause after December 1, 2006 and who were paid by the hour or were salaried, other than the Ineligible Employees. The BMembers are listed on Exhibit B to the Settlement Agreement.

- The second subclass ("CMembers") is made up of employees that were part of the Debtor's sales force who were terminated without cause after December 1, 2006 and were compensated on a commission-only basis, other than the Ineligible Employees. The CMembers are listed on Exhibit C to the Settlement Agreement.

- The Debtor will pay $2.7 million (the "Settlement Payment") to Class Counsel in full and final satisfaction of the released Claims against the Debtor and its estate.[5]

- Upon payment of the Settlement Payment, any claims that have been scheduled on behalf of, or filed by, the Class Members in the Bankruptcy Case, on account of any alleged violation of the WARN Act or for severance or back pay or benefits arising from the termination of employment under any federal, state or local law or regulation, including, without limitation, the proofs of claims filed by certain Class Members will be disallowed in their entirety and expunged from the Debtor's schedules or claims register, as appropriate.

---

[5] Claims are defined as the claims of each Class Member that relate to or are based on the WARN Act or back or severance pay or benefits under any federal, state or local law or regulation arising out of the termination of the Class Members' employment by the Debtor, including, but not limited to: (i) all claims asserted or that could have been asserted in the WARN Act Litigation; (ii) the Individual WARN Claims; and (iii) any other claims for back or severance pay or benefits based on or arising out of any federal, state or local statute, ordinance or regulation; provided, however, that the following claims and/or rights shall not be released: (a) any claims for continuation of health or medical coverage, at the Class Member's expense, or at the expense of a beneficiary or dependant of a Class Member, to the extent allegedly required by the relevant provisions of the Consolidated Omnibus Budget Reconciliation Act of 1985 ("*COBRA*"); (b) any claims for expense reimbursement; unpaid wages or commission unrelated to the WARN Act; (c) any prepetition claims arising out of obligations of the Debtor unrelated to the WARN Act Litigation, the WARN Act, or back or severance pay or benefits; (d) rights, if any, unrelated to Class Members' WARN claims, under the Debtor's 401(k) plans; and (e) any claims which the law clearly states may not be released by settlement.

- All amounts distributed to Class Members under the Settlement will be inclusive of each such Member's *pro rata* share of attorneys' fee and cost recovery claims and rights.

- Before any distribution to the Class Members, Class Counsel will make the following payments from the Settlement Payment:

  - $2,500 will be paid to both Class Representatives (the "Service Payment") as payment for the services they provided to the Class in connection with the prosecution of the WARN Action; and

  - $975,000, which includes 33⅓ of the gross settlement amount for attorney's fees and $75,000 for out-of-pocket costs and third-party settlement administration fees will be paid to Class Counsel (the "Class Counsel Fees").[6]

  - $107,500 will be paid to Class Counsel which shall be used to pay 50% of the estimated employer portion of Federal Insurance Contribution Act ("FICA") taxes and required federal and state unemployment taxes. (the "Tax Payment").[7]

- After payment of the Service Payment, the Class Counsel Fees, and the Tax Payment, Class Counsel will retain for distribution to Class Members the net amount of $1,612,500 (the "Common Fund"). Upon election of the Debtor, upon consultation with the Committee, the Debtor may elect to have a Qualified Settlement Fund established to distribute and administer the Common Fund pursuant to 26 U.S.C. section 468B and the terms of the Settlement Agreement. The Common Fund and, if elected, the Qualified Settlement Fund are referred to herein as the Common Fund.

- The Common Fund will be distributed to the Class Members, as follows:

---

[6] Class Counsel contends that a contingency fee of 33⅓% plus costs is typical in a WARN Act class action. Class Counsel submits further that the class representatives and over 150 other plaintiffs directly engaged the Klehr firm (as well as Berger & Montague, P.C.) pursuant to fee agreements that authorized 33⅓% contingency plus costs. Furthermore, for the reasons set forth in detail in the certification of Charles A. Ercole, Esquire, Class Counsel believes the fee award is reasonable because: 1) the billing records accurately reflect the time involved; 2) the hourly rates are reasonable for attorneys of similar experience in the legal field and geographic region; 3) the ratio between the lodestar time value and the fee requested is less then 3 to 1, which is well within the range approved by courts within the Third Circuit; and 4) Klehr Harrison's experience in WARN Act class actions qualifies them to act as Class Counsel.

[7] The Debtor will pay the other 50% of the estimated employer payroll taxes ($107,500), hence, a total of $2,807,500 is being paid for the benefit of the Class.

16

- $1,317,464 to the BMembers, representing approximately 81% of the Common Fund. The amounts to be paid to each BMember are derived by allocating pro rata to each BMember based on the maximum theoretical amount of their WARN claim. The amounts, received by the BMembers, after the deduction of their pro rata portion of the Subject Payments, but prior to any deduction or withholding for applicable federal, state or local taxes, will be deducted from and shall automatically reduce the priority portion of each BMember's allowed claim, if any, for unpaid wages or wage equivalents, commissions, unpaid vacation, sick leave, paid time off or any other wage equivalent or related claims that are not based on the alleged failure to provide notice under the WARN Act., on a dollar-for-dollar basis, pursuant to this Settlement Agreement, without further order of the Bankruptcy Court. The amounts to be distributed to each BMember is shown on Exhibit B to the Settlement Agreement.[8]

- $295,036 to the CMembers, representing approximately 19% of the Common Fund. The amounts to be paid to each CMember are derived by imputing a daily rate for each CMember based on the federal minimum wage of $5.15 per hour multiplied by 8 hours and adding a daily benefit of $13. That total daily rate of $41.20 was then multiplied by 60 for each CMember. The total was then multiplied by 50%. The amount of $973 received by the CMembers, after the deduction of their pro rata portion of the Subject Payments, but prior to any deduction or withholding for applicable federal, state or local taxes, will be deducted from and shall automatically reduce the priority portion of each CMember's allowed claim, if any, for unpaid wages or wage equivalents, commissions, unpaid vacation, sick leave, paid time off or any other wage equivalent or related claims that are not based on the alleged failure to provide notice under the WARN Act., on a dollar-for-dollar basis, pursuant to this Settlement Agreement, without further order of the Bankruptcy Court. The amounts to be distributed to each CMember is shown on Exhibit C to the Settlement Agreement.

---

[8] In calculating the maximum theoretical amount of the WARN claims, the daily rate of individual Class Members was determined by dividing each hourly/salaried employee's annual wages by 260. Each Class Member's maximum theoretical WARN claim was determined by multiplying each Class Member's daily rate by 60. The amounts set forth on Exhibits B and C are as accurate as possible at the time of the filing but if additional Class members are located or other changes are required then distributions will be adjusted accordingly.

17

- Any Residual Funds, due to Class Members' failure to cash checks within 241 days, wrong addresses, etc., shall be disbursed to The Impact Fund, a non-profit organization dedicated to employee rights. No portion of the Residual Funds will revert to the Debtor for any reason, or be retained by Class Counsel.

- In the event a Class Member opts out of the Settlement Agreement, the Settlement Payment shall be reduced by such opting-out Class Members' share of the Common Fund as shown on **Exhibits B and C.**

- Issuance of Class Notice: Class Counsel shall send by first class mail to each Class Member's last known address, a notice (the "Notice") indicating:

  - that each Class Member has the right to opt-out of the Class and preserve all of his/her rights against the Debtor, if any, including the released Claims;

  - the last date such Class Member was paid, the office location to which the Class Member was assigned as of the date of his/her termination, and the Class Member's annual or year-to-date income on the date of termination, depending on whether the Class Member was salaried or hourly;

  - that the Settlement Agreement shall become effective only if it is finally approved by the Court;

  - that upon Court approval of the Settlement Agreement, it shall be effective as to all Class Members that do not opt-out of the Class; however, if more than fifty (50) of the Class Members timely opt-out of the Settlement Agreement, then the Debtor may, upon consultation with the Committee, elect to terminate the Settlement Agreement and it shall not become effective;

  - that all released Claims (as defined in section 22 of the Settlement Agreement) of any Class Member who does not opt out of the Settlement Agreement shall be waived, and that no person, including the Class Member, shall be entitled to any further distribution thereon;

18

- the dollar amount, prior to the deduction or withholding of applicable taxes, such Class Member would receive under the Settlement Agreement, before deducting attorneys' fees, as well as an estimate of such net payment after Class Counsel Fees have been deducted; and

- that such Class Member has the right to object to the Settlement Agreement, to retain counsel and be heard at the Fairness Hearing.

**Relief Requested**

41.     By this Joint Motion, the Parties request that the Court enter orders: (i) authorizing the Parties to enter into the Settlement Agreement; (ii) certifying the Class for settlement purposes only, appointing Class Counsel and Class Representatives and preliminarily approving the Settlement Agreement; (iii) Approving the form and manner of the Class Notice; (iv) scheduling a Fairness Hearing to consider final approval of the Settlement Agreement; and (v) approving the Settlement Agreement on a final basis.

**Basis for Relief Requested**

**A.     The Court Should Approve the Settlement Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure**

42.     The Third Circuit has emphasized that "to minimize litigation and expedite the administration of a bankruptcy estate 'compromises are favored in bankruptcy.'" *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (quoting 9 COLLIER ON BANKRUPTCY ¶ 9019.03[1] (15th ed. 1993)); *see also, In re Culmtech, Ltd.*, 118 B.R. 237, 238 (Bankr. M.D. Pa. 1990) ("[C]ompromises are favored in bankruptcy and … much of litigation in bankruptcy estates results in settlements"). Bankruptcy Rule 9019 authorizes a bankruptcy court to approve a compromise or settlement after notice and a hearing, FED. R. BANKR. P. 9019(a),

19

and section 105 of the Bankruptcy Code empowers a court to issue any order that is "necessary or appropriate." 11 U.S.C. § 105(a).

43. "[T]he authority to approve a compromise settlement is within the sound discretion of the bankruptcy court." *In re Key3Media Group, Inc.*, 336 B.R. 87, 92 (Bankr. D. Del. 2005); *see also, In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997). When exercising such discretion, the bankruptcy court must determine whether the compromise is "fair, reasonable, and in the best interest [sic] of the estate." *Key3Media*, 336 B.R. 87, 92; *see also, Fry's Metals, Inc. v. Gibbons (In re RFE Industries, Inc.)*, 283 F.3d 159, 165 (3d Cir. 2002); *In re Louise's, Inc.*, 211 B.R. at 801; *In re Marvel Entertainment Group, Inc.*, 222 B.R. 243, 249 (Bankr. D. Del. 1998).

44. The bankruptcy court is not required to determine that the proposed settlement is the best possible compromise. *In re Key3Media Group*, 336 B.R. at 92-93 (citing *In re Coram Healthcare Corp.*, 315 B.R. 321, 329 (Bankr. D. Del. 2004)). Rather, the settlement should be approved as long as it does not fall below the lowest point in the range of reasonableness. *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir.) (1983). In this respect, it is unnecessary for the court to consider the information necessary to resolve the factual dispute, nor is it necessary for the bankruptcy court to "conclusively determine claims subject to a compromise." *Key3Media Group*, 336 B.R. at 92 (quoting *In re Martin*, 212 B.R. 316, 319 (BAP 8th Cir. B.A.P. 1997)).

20

## Standards for Approval of the Settlement Agreement

45.     Courts consider the following four factors when determining whether a settlement is in the best interests of the estate: (i) the probability of success in the litigation; (ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attendant thereto; and (iv) the paramount interest of the creditors and a proper deference to their reasonable opinions. *Martin*, 91 F.3d at 393; *Aetna Casulaty & Surety v. Jasmine, Ltd. (In re Jasmine, Ltd.)*, 258 B.R. 119, 123 (Bankr. D.N.J. 1999); *Key3Media Group*, 336 B.R. at 93; *Marvel*, 222 B.R. at 249.

46.     In addition to these criteria, courts have also scrutinized additional factors, such as (i) the competency and experience of counsel who support the settlement; (ii) the relative benefits to be received by individuals or groups within the class; (iii) the nature and breadth of releases to be obtained by the parties to the settlement; and (iv) the extent to which the settlement is the product of arm's length bargaining. *See Fischer v. Pereira (In re 47-49 Charles Street, Inc.)*, 209 B.R. 618, 620 (S.D.N.Y. 1997); *In re Spielfogel*, 211 B.R. 133, 144 (Bankr. S.D.N.Y. 1997); *In re Dow Corning Corp.*, 198 B.R. 214, 223 (Bankr. E.D. Mich. 1996).

## Application of the Martin Factors[9]

47.     The results of a trial are uncertain and the litigation is complex. The WARN Action involves numerous legal issues regarding the application of the WARN Act and its statutory and other legal defenses to complex facts. These issues include, *inter alia*, (i)

---

[9]   This section discusses both the first and third *Martin* factors – uncertainty of success and complexity of litigation – because in this case these issues are intertwined. The second factor – difficulty with collection – does not apply because the Debtors are the defendants.

whether the Debtor's WARN Notices provided adequate notice to the Class Members under the WARN Act; (ii) whether the Debtor was entitled to give fewer than sixty days' notice because of the unforeseeable business circumstances that caused the Debtor to fail; (iii) whether the Debtor was entitled to give fewer than sixty days' notice because, at the time notice would otherwise have been required, it was seeking new capital it reasonably believed, if obtained, would have obviated or substantially postponed the alleged plant closing or mass layoffs; (iv) whether the Debtor has other defenses to the application of the WARN Act; (v) whether the employment losses allegedly suffered by the aggrieved employees were caused by the Debtor's failure to obtain capital or business; (vi) whether the Debtor gave "as much notice as practicable"; (vii) whether the Debtor is entitled to a defense of "good faith;" (viii) the computation of the amount of damages; (ix) whether the Debtor is entitled to setoffs against damages for sums paid prepetition and postpetition to employees; (x) whether employees of the Debtor that were paid on a commission-only basis are entitled to WARN damages;[10] (xi) whether attorneys' fees are to be awarded to the Class Members if they prevail and whether such fees are entitled to administrative priority; and (xii) whether the alleged damages are entitled to administrative

---

[10] The Parties are unaware of any authority addressing the application of the WARN Act to commission-only employees. However, Debtor argues that in *Local Joint Executive Board of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.* 344 F.3d 1152 (9th Cir. 2001), the Ninth Circuit held that since the WARN Act is intended to compensate employees for the money they would have earned but for their termination without the requisite notice, in order for employees to have non-regular pay such as tips included in the computation of their WARN damages, the employees must be able to prove the amount of tips they would have received had they not been terminated. Debtor contends that it was completely disabled from originating wholesale loans because its Warehouse Lenders had terminated its lines of credit and the states it was doing business in had issued cease and desist orders prohibiting the Debtor from originating new loans. Accordingly, the Debtor contends, the commission-only employees (who were the Debtor's sales employees who were paid a commission for the origination of loans) cannot meet their burden to prove that but for the terminations, they would have received commissions. The Debtor contends that whether or not these employees were terminated, they would not have been able to originate new loans after December 29, 2006 when the Warehouse Lenders terminated the Debtor's credit lines which were used for loan originations. Class counsel disputes Debtor's arguments, as discussed above.

priority under section 503(b)(1)(A) or wage or benefit priority under section 507(a)(4) or (5), respectively.[11]

48.     Continued litigation would be costly and time-consuming and expose the Debtor's estate to significant litigation risks.  Class Counsel has asserted that the Debtor's WARN Act liability of sixty (60) days' damages and benefits is approximately $8,000,000, with wage priority and $7,250,000 that constitute general unsecured claims.  The settlement provides for a payment of $2.7 million to Class Counsel and the creation of a settlement fund which resolves those claims and eliminates any further accrual of the substantial litigation expenses which have been associated with the WARN Action.  Accordingly, the Parties respectfully submit that approval of the Settlement is warranted.[12]

49.     The Settlement Agreement is in the best interest of creditors and the estate.  When determining whether a compromise is in the best interests of the estate, the Court must 'assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal.'"  *In re Key3Media Group*, 336 B.R. at 93 (quoting *In re Martin*, 91 F.3d at 393 (citing *TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968))); *see also, In re Nationwide Sports Distributors, Inc.*, 227 B.R. 455, 460 (Bankr. E.D. Pa. 1998) ("[I]n deciding whether to approve a particular compromise, courts utilize various criteria designed to achieve the objective of having the Trustee or debtor in

---

[11] The Debtor argues that the Delaware Bankruptcy Court has recently held that WARN damages resulting from pre-petition employment terminations are not entitled to administrative priority, but rather are treated as priority wage claims up to the cap of $10,950 and general unsecured claims thereafter. *Henderson v. Powermate Holding Corp. (In re Powermate Holding Corp.)*, 394 B.R. 765 (Bankr. D. Del. 2008).  That decision has been appealed and there is no Circuit authority on the issue.

[12] In the event that the Settlement Agreement is not approved by the Bankruptcy Court or the Settlement Agreement does not become binding and enforceable for any reason, the Parties reserve all of their rights.

23

possession act in [the] best interests of the estate"). To properly balance these values, the Court should consider all factors "relevant to a full and fair assessment of the wisdom of the proposed compromise." *In re Marvel*, 222 B.R. at 249 (quoting *TMT Trailer Ferry, Inc.*, 390 U.S. at 424); *see also, Key3Media Group*, 336 B.R. at 92 ("[t]he bankruptcy court must be "apprised of all relevant information that will enable it to determine what course of action will be in the best interest of the estate.") (quoting *In re Martin*, 91 F.3d at 393).

50.     The paramount interest of creditors and reasonable deference to their views also favors approval of the Settlement Agreement. The Committee was involved in the negotiation of the Settlement Agreement and supports its approval. Moreover, as set forth above, the Settlement Agreement spares the Debtor the significant expense and uncertainty associated with the litigation of the myriad of issues in the WARN Action.

51.     Accordingly, in light of each of the *Martin* factors, the Settlement Agreement should be approved.

**B.**     **The Court Should Certify the Class, Appoint Class
Counsel, and Preliminarily Approve the Settlement
Agreement Pursuant to Rule 23 of the Federal Rules of Civil Procedure.**[13]

52.     Where, as in this case, the Court has not already certified a class, before
approving a class settlement pursuant to Civil Rule 23, the Court must determine whether the
proposed settlement class satisfies the certification requirements of Civil Rule 23. *Amchem v.
Windsor*, 521 U.S. 591, 620 (1997); *In re Community Bank of Northern Virginia*, 418 F.3d 277,
300 (3rd Cir. 2005).

53.     "[A]ll Federal Circuits recognize the utility of Rule 23(b)(3) settlement
classes." *Amchem*, 521 U.S. at 618. *Accord Community Bank*, 418 F.3d at 299. "The settlement
class action device offers defendants the opportunity to engage in settlement negotiations without
conceding any of the arguments they may have against class certification." *Community Bank*,
418 F.3d at 299. *See also, General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
55 F.3d 768, 786 (3rd Cir. 1995) ("By specifying certification for settlement purposes only . . .
the court preserves the defendant's ability to contest certification should the settlement fall
apart.").

54.     Subdivisions (a) and (b) of Rule 23 "focus court attention on whether a
proposed class has sufficient unity so that absent members can fairly be bound by decisions of
class representatives." *Amchem*, 521 U.S. at 621.

---

[13] The positions taken in this section of the Joint Motion are those of Class Counsel only. The Debtors and the
Committee take no position on these matters other than to support approval of the Settlement Agreement and Class
Certifications for purposes of settlement only. In the event the Settlement Agreement does not become effective, the
Parties would be restored to the same position they were in prior to the filing of the Joint Motion and execution of
the Settlement Agreement and all Parties could assert any claims or defenses that existed prior to the execution of
the Settlement Agreement and the filing of the Joint Motion.

**C.**     **The Court Should Conditionally Certify the Settlement Class**

55.     To be certified, a class must satisfy the four requirements of Rule 23(a): (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. FED. R. CIV. P. 23; *Community Bank*, 418 F.3d at 302. In addition, the class must satisfy the requirements of Rule 23(b)(1), (2), or (3). In this case, the Parties have agreed to request conditional certification under Rule 23(b)(3), "the customary vehicle for damage actions." *Id.* In order to certify a class under Rule 23(b)(3), the court must make two additional findings: predominance and superiority. That is, "[i]ssues common to the class must predominate over individual issues, and the class action device must be superior to other means of handling the litigation." *Gates v. Rohm & Hass Co.*, 248 F.R.D. 434, 442-43 (E.D. Pa 2008).

56.     The proposed settlement Class meets each of the foregoing elements.

### The Rule 23(a) Criteria

57.     Numerosity requires a finding that the putative class is "so numerous that joinder of all members is impracticable." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 182 (3d Cir. 2001). "No single magic number exists satisfying the numerosity requirement." *Beherend v. Comcast Corp.*, 245 F.R.D. 195, 202 (E.D. Pa. 2007) (citing *Moskovitz v. Loop*, 128 F.R.D. 624, 628 (E.D. Pa. 1989). However, the Third Circuit "typically has approved classes numbering 40 or more." *Gates*, 248 F.R.D. at 440 (citing *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001)).

58.     The proposed class of 1650 Class Members meets the numerosity requirement and joinder of all Class Members is impractical. Subclass One is made up of 1351

individuals. Subclass Two is made up of 303 individuals. These subclasses are sufficiently numerous to make joinder of all members impractical, and thus satisfy the numerosity requirement. *See Gates*, 248 F.R.D. at 440 (finding that two classes made up of 400 and 1,000, respectively, satisfied the numerosity requirement). Accordingly, the Court should find that the numerosity requirement is met.

59.     The commonality requirement requires existence of at least one question of law or fact common to the Class. FED. R. CIV. P. 23(a)(2); *Johnston v. HBO Film Management, Inc.*, 265 F.3d 178, 184 (3d Cir. 2001). The commonality threshold is low, *Powers v. Lycoming Engines*, 245 F.R.D. 226, 236 (E.D. Pa. 2007), and does not require "an identity of claims or facts among class members," *Behrend*, 245 F.R.D. at 202. Further, the existence of individual facts and circumstances will not defeat commonality so long as the Class Members allege harm under the same legal theory.

60.     Here, fundamental issues of law and fact regarding notice of termination, applicability of several defenses, measure of damages and priority of claims and attorneys' fees are common to all Class Members.[14]

61.     As discussed above, some Class Members were paid a salary or hourly wage while members of the sales group were paid on a commission-only basis. To reflect the fact that the employees paid on a commission-only basis have weaker claims than the employees that were paid a salary or hourly wage, they will receive smaller settlement payments as

---

[14] Class Counsel recognizes that the amount of damages is particular to each Class Member. However, individualized damages calculations do not defeat commonality, "so long as the plaintiffs allege harm under the same legal theory." *Baby Neal v. Casey*, 43 F.3d 48, 56-58 (3d Cir. 1994).

members of Subclass Two. The differences in the strength of the claims does not destroy commonality. In cases where the claims or defenses differ between class members, a court may use subclasses to treat individual issues separately. *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir. 1985). Accordingly, as part of the Settlement Agreement, two subclasses have been created.

62.     Typicality requires that the "named plaintiffs" claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class." FED. R. CIV. P. 23(a)(3); *Beck v. Maximus, Inc.*, 457 F.3d 291, 295-296 (3d Cir. 2006) (quoting Baby Neal, 43 F.3d at 55). "Typicality requires a strong similarity of legal theories to ensure that the class representatives' pursuit of their own goals will work to benefit the entire class." *Powers*, 245 F.R.D. at 236. "Factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory." *Beck*, 457 F.3d at 295-296 (quoting *Baby Neal*, 43 F.3d at 55).

63.     The Class Representatives do not allege that they were singled out; instead, they allege that they suffered harm as a result of the same conduct that allegedly injured the absentee Class Members–they were laid off by the Debtor on or after January 2, 2007, without receiving sixty (60) days' notice. Accordingly, the Court should find that the typicality requirement is met.

64.     With respect to adequacy, class representatives must "fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4); *Gates*, 248 F.R.D at 441. The adequacy inquiry "assures that the named plaintiffs' claims are not antagonistic to the class

and that the attorneys for the class representatives are experienced and qualified to prosecute the claims on behalf of the entire class." *Beck*, 457 F.3d at 296. Thus, the court must determine "whether the representatives' interests conflict with those of the class and whether the class attorney is capable of representing the class." *Johnston*, 265 F.3d at 185.

65. The Court should find that the Class Representatives and Class Counsel adequately represent the interests of the Class Members. As demonstrated in the Motion for Class Certification and the supporting exhibits filed earlier in this matter, Class Counsel are well qualified and experienced to represent the Class Members. Class Counsel's lead attorney has been appointed as class counsel in over seven WARN actions, most of which were in bankruptcy cases.

### The Rule 23(b)(3) Criteria

66. Common questions of law and fact predominate over the individual issues (which appear to be limited to each Class Members' pay and benefits under the WARN Act). Predominance tests whether the proposed class is sufficiently cohesive to warrant adjudication by representation. *Amchem*, 521 U.S. at 623-24; *Community Bank*, 418 F.3d at 308-09. The proper predominance inquiry "trains on the legal or factual questions that qualify each member's case as a genuine controversy, questions that preexist any settlement." *Amchem*, 521 U.S. at 623. "In this vein a predominance analysis is similar to the requirement of Rule 23(a)(3) that claims or defenses of the named representatives must be typical of the claims of defenses of the classes." *Community Bank*, 418 F.3d at 309.

67. Just as typicality exists, predominance also exists. All of the claims arise from an alleged violation of the WARN Act resulting from the Debtor's shut down on or after January 2, 2007. Accordingly, the Court should find that the predominance requirement is met.

68. Rule 23(b)(3) also requires a determination that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." FED. R. CIV. P. 23(b)(3); *Gates*, 248 F.R.D. at 443. In effect, "[t]he superiority requirement asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *(Krell v. Prudential Inc. Co. (In re Prudential Inc. Co.)*, 148 F.3d at 283 (316, 3d Cir. 1998).

69. Rule 23 sets forth several factors relevant to the superiority inquiry: "(A) the class members interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular form; and (D) the likely difficulties in managing a class action." FED. R. CIV. P. 23(b)(3); *Gates*, 248 F.R.D. at 443. However, when a class certification is being considered for settlement purposes only, the difficulties in managing a class action are not considered. *Gates*, 248 F.R.D. at 443.

70. Here, a class action is superior to individual actions. First, as shown by Exhibits B and C to the Settlement Agreement, the amount of each Class Member's claim is relatively small. Individually, there is little incentive in controlling the prosecution of separate actions. *See Amchem*, 521 U.S. at 617 ("The policy at the very core of the class action

30

mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.") (quotation and citation omitted). No WARN Act litigation relating to the Debtor is pending against the Defendants outside of this Court. Further, it is appropriate that all the claims against the Debtor arising from the Class Representatives' allegations should be concentrated in this Court. In addition, determining the claims of some Class Members, but not all, could prejudice the claims of the remaining Class Members. Accordingly, the Court should find that the superiority element is met.

71.     Based on the foregoing, the Court should certify the Class for settlement purposes, appoint Giuseppe Caccamo and Robie-Lyn Harnois as the Class Representatives and appoint Klehr, Harrison, Harvey, Branzburg & Ellers LLP as Class Counsel.

**D.      The Court Should Preliminarily Approve the Settlement**

72.     After class certification, approval of a class settlement generally requires two hearings: one preliminary approval hearing and one final "fairness" hearing. *Gates*, 248 F.R.D. 434. Once a settlement is preliminarily approved, notice of the proposed settlement and of the fairness hearing is provided to class members. Because the Settlement Agreement in this case will be preliminarily approved pursuant to this Joint Motion, notice of the conditional class certification and proposed settlement can be combined in one notice. *Gates*, 248 F.R.D. at 445; *Collier v. Montgomery County Housing Authority*, 192 F.R.D. 176, 186 (E.D. Pa. 2000) (citing

31

MANUAL FOR COMPLEX LITIGATION § 30.212, at 226). At the subsequent fairness hearing, class members may formally object to the proposed settlement. *Gates*, 248 F.R.D. at 439.

73.     "The preliminary approval decision is not a commitment [to] approve the final settlement; rather, it is a determination that 'there are no obvious deficiencies and the settlement falls within the range of reason.'" *Id.*, at 438 (quoting from *Smith v. Professional Billing & Management Services, Inc.*, 2007 WL 4191749, at *1 (D. N.J. Nov. 21, 2007)). *See also, In re Community Bank of Northern Virginia*, 2008 WL 3833271 (D.C.W.D. Pa. Aug. 15, 2008) (conditionally certifying class and preliminarily approving settlement before holding final hearing). The preliminary approval determination requires the Court to consider whether "(1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *In re General Motors Corp.*, 55 F.3d 7768 at 85-86; *Gates*, 248 F.R.D. at 444. When class certification is sought in conjunction with preliminary approval, then class member objections are not relevant. *Gates*, 248 F. R. D. at 444.

74.     The Settlement Agreement has no obvious deficiencies and falls well within the range of reason. Further, each of the above-cited factors favors preliminary approval of the Settlement Agreement. First, the Settlement is the result of good faith arm's length negotiations between capable adversaries. The primary negotiating parties have been in discussions with respect to the WARN action since it was filed almost two years ago. As noted above, the Class is represented by counsel with extensive experience and expertise in WARN Act matters.

32

75. Second, the Parties exchanged a significant amount of information during their negotiations. In particular, the Debtor provided comprehensive responses to the document requests of Class Counsel and provided extensive information to Class Counsel regarding facts and documents supporting its defenses. These facts included both the Debtor's efforts to obtain financing and the sudden melt-down of the subprime mortgage industry and the sudden and unilateral decision of the Debtor's lenders to withdraw capital which disabled the Debtor from originating mortgages. The Debtor has also shared payroll information and the WARN damages analysis with Class Counsel.

76. Class Counsel has the experience and skill to both vigorously litigate WARN Act claims and to determine when and to what extent settlement is appropriate. They exercised that judgment in this case with respect to the Settlement Agreement. In addition and as noted above, proposed Class Counsel have been appointed lead Class Counsel in several WARN Act cases, most of which have occurred in bankruptcy.

77. Accordingly, the Court should preliminarily approve the Settlement Agreement.

**E.    The Court Should Approve the Form and
       Manner of the Proposed Notice of the Settlement.**

78. Rule 23(c)(2)(B) provides:

For any class certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the

33

class claims, issues, or defenses; (iv) that a class member may
enter an appearance through an attorney if the member so desires;
(v) that the court will exclude form the class any member who
requests exclusion; (vi) the time and manner for requesting
exclusion; and, (vii) the binding effect of a class judgment on
members under Rule 23(c)(3).

FED. R. CIV. P. 23(c)(2)B).

79.     In addition, Rule 23(e) requires that all members of the class be notified of

the terms of any proposed settlement. FED. R. CIV. P. 23(e). The Rule 23(e) requirement is

"designed to summarize the litigation and the settlement and to apprise class members of the

right and opportunity to inspect the complete settlement documents, papers, and pleadings filed

in the litigation." *In re Prudential*, 148 F.3d at 326-27.

80.     The proposed Class Notice and Opt-Out Notice Form, which are attached

as Exhibits D to the Settlement Agreement, will be served by Class Counsel upon each Class

Member. Class Counsel proposes that within **ten business days** following entry of the order

certifying the Class for settlement purposes and preliminarily approving the Settlement

Agreement, Class Counsel will serve the Notice and Opt-Out Notice Form substantially in the

form attached to the Settlement Agreement, upon each Class Member at the last known

addresses of each Class Member according to the Debtors' books and records. *Cf. Prudential*,

148 F.3d at 327 (holding that mailings to last known addresses of class members and publication

in national newspapers sufficient to provide notice to large, multi-state class).

81.     The Class Notice includes each of the facts required by Rule 23(c)(2)(B).

The Class Notice also outlines the terms of the Settlement Agreement, including the attorneys'

fees proposed to be paid to Class Counsel and describes how each Class Member may obtain a

34

copy of the pleadings in the WARN Action and a copy of the Settlement Agreement. The Class

Notice also states the date, time, location and purpose of the Fairness Hearing, informs each

Class Members of their right to appear at the Fairness Hearing, and describes the procedure for

objecting to the Settlement Agreement. Finally, the Class Notice will contain a personalized

attachment for each Class Member setting forth the projected dollar amount such Class Member

would receive under the Settlement Agreement, before and after deduction of Class Counsel

Fees. Accordingly, the form and manner of the Class Notice is sufficient and should be

approved.

**F.**     **The Court Should Finally Approve the Settlement at the Fairness Hearing.**

82.     The Court should set a Fairness Hearing that, subject to the Court's

calendar, would be heard at least 90 days after the Debtor has provided notice to appropriate

state and federal officials pursuant to 28 U.S.C. section 1715 (the Class Action Fairness Act). At

the Fairness Hearing, the Court should finally approve the Settlement Agreement.

83.     Rule 23(e) provides that "[t]he claims, issues, or defenses of a certified

class may be settled, voluntarily dismissed or compromised only with the court's approval." *Id.*

Final approval of a settlement pursuant to Rule 23(e) turns on whether the settlement is "fair,

reasonable and adequate." FED. R. CIV. P. 23(e)(2); *In re Cendant Corp. Litig.*, 264 F.3d 201,

231 (3d Cir. 2001). "This inquiry requires the court's independent and objective analysis of the

evidence and circumstances before it in order to determine whether the settlement is in the best

interest of those whose claims will be extinguished." *Community Bank*, 2008 WL 3833271 at *

5 (quoting *General Motors*, 55 F.3d at 785.).

84.     The Third Circuit has held that the following nine factors are relevant in determining whether a proposed class settlement is fair, reasonable, and adequate: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best recovery; and (9) the range of reasonableness of the settlement in light of all the attendant risks of litigation. *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975). This list is not exhaustive. *Community Bank*, 2008 WL 3833272 at *6.

85.     The following *Girsh* factors strongly support approval of the Settlement Agreement.

- Litigation will be complicated, protracted and expensive.

- The Class Representatives support the Settlement Agreement and Class Counsel believe that the bulk of the other Class Members will have a favorable reaction to the Settlement Agreement and will neither object to it nor opt out of it.

- The Settlement Agreement was reached after the essential facts had been thoroughly investigated by Class Counsel through extensive document production by the Debtor.

- The risk that the Class Representatives would be unable to establish liability was significant because of the numerous defenses asserted by the Debtor.

- When considered in light of the best possible recovery and the attendant risks, the settlement falls well within the range of reasonableness. The settlement provides for payment of $2.7 million, representing approximately 33% of the maximum theoretical priority claim of the Class. *See Community Bank*, 2008

36

WL 3833271 (finding that in light of the attendant risk a settlement representing 12.6% of the prayer was reasonable). Further, while the Complaint alleges that any damages are entitled to administrative priority, Class Counsel acknowledges that the Court has recently held that WARN damages arising from prepetition terminations are only entitled to priority wage status. *Powermate*, 394 B.R. 765 (Bankr. D. Del. 2008).

86.     Based on the foregoing, the Court should finally approve the Settlement

## Conclusion

WHEREFORE, the Parties respectfully request the Court to enter Orders: (i) granting the Motion in its entirety; (ii) authorizing the Parties to enter into the Settlement Agreement; (iii) certifying the Class for settlement purposes only; (iv) appointing Class Counsel and Class Representatives and preliminarily approving the Settlement Agreement; (vi) approving the form and manner notice of the Class Notice; (vii) scheduling a Fairness Hearing; (viii) approving the Settlement Agreement on a final basis; and (ix) granting such other relief as the Court deems necessary and appropriate.

*[SIGNATURES ON FOLLOWING PAGES]*

Dated: April 17, 2009　　　　　　　PACHULSKI STANG ZIEHL & JONES LLP

By　　*/s/ Kathleen P. Makowski*
　　　　Laura Davis Jones (Bar No. 2436)
　　　　Kenneth H. Brown (CA Bar No. 100396)
　　　　Kathleen P. Makowski (Bar No. 3648)
　　　　919 North Market Street, 17th Floor
　　　　P.O. Box 8705
　　　　Wilmington, DE  19899-8705
　　　　(Courier 19801)
　　　　Telephone:  (302) 652-4100
　　　　Facsimile:  (302) 652-4400

　　　　Email: ljones@pszjlaw.com
　　　　　　　　kbrown@pszjlaw.com
　　　　　　　　kmakowski@pszjlaw.com

　　　　Counsel for Defendant
　　　　MORTGAGE LENDERS NETWORKS
　　　　USA, INC.

Dated: April 17, 2009　　　　　　　BLANK ROME LLP

By　　*/s/ David W. Carickhoff*
　　　　David W. Carickhoff (Bar No. 3175)
　　　　1201 Market Street, Suite 800
　　　　Wilmington, DE 19801
　　　　Telephone: (302) 425-6400
　　　　Facsimile: (302) 425-6464

　　　　Email: Carickhoff@BlankRome.com

　　　　and

　　　　Michael B. Schaedle
　　　　One Logan Square
　　　　130 North 18th Street
　　　　Philadelphia, PA  19103-6998
　　　　Telephone:  (215) 569-5762
　　　　Facsimile:  (215) 832-5762

　　　　Email: schaedle@BlankRome.com

　　　　Counsel for the Official Committee of
　　　　Unsecured Creditors of MORTGAGE
　　　　LENDERS NETWORKS USA, INC.

38

Dated: April 17, 2009

KLEHR, HARRISON, HARVEY, BRANZBURG
& ELLERS, LLP

By    /s/ *Richard M. Beck*
      Richard M. Beck, Esquire (ID#3370)
      919 Market Street, Suite 1000
      Wilmington, DE 19207
      (302) 426-1189

      and

      Charles A. Ercole, Esquire
      KLEHR, HARRISON, HARVEY,
      BRANZBURG & ELLERS, LLP
      260 S. Broad Street
      Philadelphia, PA 19102-5003
      (215) 568-6060

      *Counsel for the Named Plaintiffs*

00001-001\DOCS_DE:147187.1